**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,                                   Civil Action No. 1:20-cv-1181

v.

MICHAEL W. ACKERMAN,

       Defendant.

_____ /

**[PROPOSED] DEFAULT JUDGMENT**
**AGAINST DEFENDANT MICHAEL ACKERMAN**

On February 11, 2020, Plaintiff Securities and Exchange Commission filed its Complaint in this action against Defendants Michael Ackerman ("Ackerman"), seeking injunctive relief, disgorgement of ill-gotten gains with prejudgment interest, and a civil money penalty for violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] (Counts I-III), and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [17 C.F.R. § 240.10b-5] (Counts IV-VI)., for violations of the Commodity Exchange Act and its implementing regulations. [ECF No. 1].

Ackerman was properly served with process by personal service on February 25, 2020. [ECF No. 7].  Ackerman failed to appear or answer the Complaint, and the Clerk of Court entered a certificate of default against him on July 28, 2020. [ECF No. 11].

The Commission has moved this Court to grant judgment by default against Ackerman, order permanent injunctive relief, and impose disgorgement and a civil monetary penalty in amounts to be determined after restitution and sentencing have concluded in two parallel cases based on the same conduct at issue in this case: *CFTC v. Ackerman*, 1:20-cv-01183-NRB (SDNY), *U.S. v. Ackerman*, 20-cr-00093-LTS (SDNY).

The Court has carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's memorandum in support of its Motion, other written submissions filed with the Court, and the record in this case, and being fully advised in the premises, it is hereby:

**ORDERED** that the Plaintiff's Motion for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalty, and Other Statutory and Equitable Relief against Defendants Michael Ackerman, Q3 Holdings, LLC and Q3 I, LP is **GRANTED**.

Accordingly, the Court enters findings of fact, conclusions of law, and an Order of Judgment by Default ("Order") pursuant to Sections 6c and 6d of the Act, 7 U.S.C. § 13a-1 (2018), as set forth herein.

## I. The Defendant and Related Entities

### A. Defendant

1.      Defendant Ackerman is a resident of Sheffield Lake, Ohio. He is a member of the management team and one of the three owners of Q3 Holdings, LLC, which is Q3 I's general Case 1:20-cv-01181 Document 1 Filed 02/11/20 Page 3 of 18 4 partner. Ackerman is a former registered representative of TradeStation Securities, Inc., Fortis Clearing Americas, LLC and UBS Securities, LLC. He held Series 7 and 63 licenses until they lapsed in 2011. According to Q3 I's private placement memorandum, Ackerman was an institutional broker on the floor of the New York Stock Exchange for 16 years. [ECF No. 1, at ¶ 15].

### B.  Related Entities

2.      Q3 Holdings, LLC is a Delaware limited liability company formed on June 10, 2018. Ackerman, together with his two business partners, ("Founding Partner 1" and "Founding

Partner 2"), created Q3 Holdings, LLC to act as the general partner for Q3 I. Ackerman, Founding Partner 1, and Founding Partner 2 each own 33.3% of Q3 Holdings, LLC. 17.  *Id*. at ¶ 16.

3.      Q3 I is a Delaware limited partnership formed on July 27, 2018. Q3 Holdings, LLC controls Q3 I. According to the Q3 I limited partnership agreement, Q3 I was organized for the purpose of investing in cryptocurrencies. *Id.* at ¶ 17.

4.      Q3 Trading Club is a trading club Ackerman, Founding Partner 1, and Founding Partner 2 created in about June 2017, when they deposited $15,000 of their personal funds into a trading account for the purpose of trading cryptocurrencies. Their investment strategy purportedly involved an algorithmic trading strategy created and employed by Ackerman. About a month later, in July 2017, the Club began seeking investors through Facebook and word of mouth. *Id.* at ¶ 18.

## II. <u>Jurisdiction and Venue</u>

5.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), (e) and 78aa. *Id*. at ¶ 19.

6.      This Court has personal jurisdiction over Ackerman, and venue is proper in the Southern District of New York, because many of Ackerman's acts and transactions constituting violations of the Securities Act and Exchange Act occurred in the Southern District of New York. Since no later than Summer 2018, the Q3 Companies' bank accounts have been located in New York, New York. In addition, at least one investor resides in New York, New York. *Id.* at ¶ 20.

7.      In connection with the conduct alleged in this Complaint, Ackerman, directly or indirectly, singly or in concert with others, has made use of the means or instrumentalities of

interstate commerce, the means or instruments of transportation and communication in interstate commerce, or of the mails. *Id.* at ¶ 21.

### III.  The Securities Fraud

### A.  The Q3 Trading Club

8.      In approximately June 2017, Ackerman, Founding Partner 1, and Founding Partner 2 created the Q3 Trading Club to trade cryptocurrencies based on Ackerman's purportedly successful Algorithm.  *Id.* at ¶ 22.

9.      In July 2017, Ackerman, Founding Partner 1, and Founding Partner 2 began seeking investors in the Q3 Trading Club through Facebook and word of mouth. *Id.* at ¶ 23.

10.      Specifically, at that time, Founding Partner 1, who is a surgeon, was a member of a private Facebook group called the "Physicians Dads Group" (the "PD Group"). All or substantially all of the members of the PD Group were physicians. In at least one July 2017 post in the PD Group, Founding Partner 1 explained that he had joined a club in which members pooled their funds to trade cryptocurrencies and offered to explain the investment strategy to any member of the PD Group, upon request. Some of the members of the Facebook group either requested, or were invited by Founding Partner 1, to invest in the Q3 Trading Club. *Id.* at ¶ 24.

11.      Founding Partner 1 told investors that they were entitled to 50% of any trading profits, and that he, Founding Partner 2, and Ackerman were entitled to the other 50%. *Id.* at ¶ 25.

12.      New investors in the Q3 Trading Club were directed to wire their capital contributions to Founding Partner 1's personal bank account. Founding Partner 1 then wired those funds to digital currency trading platforms in New York, New York and San Francisco, California, where the investor funds were converted to cryptocurrency. *Id.* at ¶ 26.

13.     The cryptocurrency was then sent to an offshore digital currency trading platform incorporated in the British Virgin Islands where Ackerman opened a trading account in late 2017 (the "Q3 Trading Account"). *Id.* at ¶ 27.

14.     By January 2018, Ackerman was directing all of the Q3 Trading Club's trading through the Q3 Trading Account. *Id.* at ¶ 28.

## B. The Q3 I Offering

15.     On July 27, 2018, Ackerman, Founding Partner 1, and Founding Partner 2 formed Q3 I. *Id.* at ¶ 29.

16.     From no later than November 1, 2018 until at least December 2019, Ackerman, Founding Partner 1, and Founding Partner 2 offered investors the opportunity to invest in limited partnership interests in Q3 I. *Id.* at ¶ 30.

17.     31. Ackerman and his partners marketed the Q3 I investment through the distribution to potential investors of a private placement memorandum (the "PPM"), a limited partnership agreement, and a subscription agreement. *Id.* at ¶ 31.

18.     The PPM, dated November 1, 2018, states Q3 I was seeking up to $15 million in investor contributions. According to the PPM, Q3 I would use investor funds to invest in cryptocurrencies using "proprietary high velocity trading software in a methodically risk mitigating fashion…." *Id.* at ¶ 32.

19.     The PPM also represented to investors that over the course of the prior 24 months, Q3 Holdings' personnel had "successfully traded various crypto currencies through various crypto exchanges using proprietary algorithmically driven software for other pooled investment groups." *Id.* at ¶ 33.

20.     According to the PPM, Q3 I would use the Algorithm and the trading experience of Q3 Holdings' management to generate trading profits, 50% of which would go to Q3 Holdings and 50% of which would be received by investors. *Id.* at ¶ 34.

21.     According to the Q3 I limited partnership agreement, dated November 1, 2018, the minimum investment in Q3 I is $50,000 and investors may make additional investments of at least $20,000. *Id.* at ¶ 35.

22.     By December 2019, the Q3 Companies had raised at least $33 million from more than 150 investors located throughout the United States. *Id.* at ¶ 36.

### C. Ackerman's Fraudulent Conduct In The Offering

23.     Ackerman engaged in fraudulent conduct in connection with the offering. *Id*. at ¶ 37.

24.     From no later than July 1, 2017 until at least December 1, 2019, Ackerman, through two entities he controlled, Q3 Trading Club and Q3 I, LP ("Q3 I") (collectively, the "Q3 Companies"), raised at least $33 million from more than 150 investors through the offer and sale of securities in the form of investment contracts. *Id.* at ¶ 2.

25.     Ackerman directed the Q3 Companies' trading and was a principal in each company. He knew, or was reckless in not knowing, the representations made to investors about the offering and falsity of the representations. *Id.* at ¶ 38.

### 1. Misrepresentations Concerning Trading Profits

26.     The Q3 Companies were able to successfully solicit new investors and continue to receive additional investments from current investors due to the purported success of the Algorithm in producing generous trading profits. *Id.* at ¶ 39.

27.     In truth, Ackerman, who conducted all trading, did not realize significant trading profits for investors using the Algorithm.  *Id.* at ¶ 40.

28.     Contrary to the representations to investors, only about $10 million, at most, of the $33 million raised from investors was invested in cryptocurrencies. *Id.* at ¶ 41.

29.     From no later than March 2018 until at least December 2019 Ackerman reported the Q3 Companies' trading profits and account balances to Founding Partner 1 and Founding Partner 2 for purposes of Founding Partner 1 calculating the Q3 Companies' trading performance and each investor's pro rata share of the purported profits. *Id.* at ¶ 42.

30.     When Ackerman reported the trading profits and account balances to Founding Partner 1 and Founding Partner 2, he knew that Founding Partner 1 would use the information to calculate the Q3 Companies' trading performance and each investors' pro rata share of profits so that Founding Partner 1 and Founding Partner 2 could disseminate this information to investors each month via email messages. *Id.* at ¶ 43.

31.     Ackerman sent these reports to Founding Partner 1 and Founding Partner 2 by text message or by sending purported screenshots of these account balances as reflected on the online trading platform for the Q3 Trading Account. *Id.* at ¶ 44.

32.     Each month from no later than March 2018 until at least December 2019 Ackerman reported to Founding Partner 1 and Founding Partner 2 that monthly trading profits were at least 15%. Ackerman sometimes modified screenshots of the Q3 Trading Account statement balances as reflected on the online trading platform to provide support for these representations. *Id.* at ¶ 45.

33.     The reports Ackerman sent Founding Partner 1 and Founding Partner 2 were false. In truth, from November 2017 until December 2019 the monthly account balance averaged only

about $1.7 million. During that time, the monthly account balance was never higher than about $5.815 million. *Id.* at ¶ 46.

34.     Nonetheless, by December 2019, Ackerman was reporting an account balance to Founding Partner 1 and Founding Partner 2 of about $310 million. In truth, however, the account only held about $428,162 in mid-December 2019. *Id.* at ¶ 47.

35.     Additionally, Ackerman drafted false email messages addressed to investors touting trading profits of 15% and higher. Ackerman sent these messages to Founding Partner 1 and Founding Partner 2 who then forwarded them to investors. *Id.* at ¶ 48.

36.     For example, on May 8, 2018, Ackerman sent Founding Partner 1 and Founding Partner 2 an email message stating that the Q3 Companies experienced trading profits of 15.11% for the month of April 2018. That same day, Founding Partner 1 forwarded Ackerman's message to investors. *Id.* at ¶ 49.

37.     Ackerman's representation was false or misleading. The trading profits were minimal, and the Q3 Trading Account had a balance of only $1,026,729.01 for the month ending April 2018. *Id.* at ¶ 50.

38.     Similarly, on March 5, 2018, Founding Partner 1 forwarded investors a message Ackerman addressed to "Q3 Members" stating "our profitability maintained a 15%+ monthly performance." *Id.* at ¶ 51.

39.     Founding Partner 1 or Founding Partner 2 reported trading profits of 15.96% for March 2018, 15.11% for April 2018 and 15.56% for August 2018.  In truth, Ackerman had only invested a fraction of the $33 million of investors' funds in cryptocurrencies and trading profits on those investments were minimal. The monthly trading account balances from November 1, 2017 until September 1, 2018 were as follows:

| Date | Account Balance |
|------|-----------------|
| 11-01-2017 | $6,027.44 |
| 12-01-2018 | $12,083.75 |
| 01-01-2018 | $145,028.76 |
| 02-01-2018 | $292,269.27 |
| 03-01-2018 | $689,558.36 |
| 04-01-2018 | $259,397.22 |
| 05-01-2018 | $1,026,729.01 |
| 06-01-2018 | $833,196.07 |
| 07-01-2018 | $2,931,675.46 |
| 08-01-2018 | $3,504,394.85 |
| 09-01-2018 | $1,936,736.03 |

*Id.* at ¶ 52.

40.     Similarly, on September 5, 2018, Ackerman prepared a message for investors stating that "we ended the month with a 15.44% gain." In truth, the account balance was $1,936,736.03 on September 1, 2018, which was about $1.5 million less than the balance on August 1, 2018. As with Ackerman's other messages to investors, Founding Partner 1 forwarded Ackerman's message to investors. *Id.* at ¶ 53.

41.     Investors received false information about the profitability of their investments because account statements were prepared based on the false information Ackerman provided. *Id.* at ¶ 54.

42.     For example, on September 1, 2019, Ackerman sent a text message to Founding Partner 1, attaching a screenshot purporting to show the Q3 Trading Account balance was about $181,930,351. Based on this information, investors received account statements showing a substantially similar balance in the Q3 Trading Account and their pro rata share of trading profits. *Id.* at ¶ 55.

43.     However, in truth the Q3 Trading Account balance was only $1,503,145.57 on September 1, 2019. *Id.* at ¶ 56.

## *2. Misrepresentations Concerning Licensing Fees*

44.     From no later than April 2018 until at least November 2019, Ackerman, Founding Partner 1, and Founding Partner 2 paid themselves at least $4 million of investors' funds as purported licensing fees based on the Q3 Companies' use of the Algorithm. *Id.* at ¶ 57.

45.     Ackerman was not entitled to any licensing fees and the licensing fees were not adequately disclosed to investors. Even if they had been, no licensing fees could have legitimately been charged because the majority of investor funds were never invested in cryptocurrencies and were therefore not exposed to the algorithmic trading strategy. *Id.* at ¶ 58.

46.     In November 2018, the PPM and Q3 I limited partnership agreement disclosed for the first time that licensing fees could be charged. *Id.* at ¶ 59.

47.     Specifically, the limited partnership agreement states that the limited partners shall pay for "any and all software licensing fees payable to the [general partner, Q3 Holdings]." *Id.* at ¶ 60.

48.     The PPM provides that: (1) the limited partners "will leverage a nonexclusive license from the [general partner, Q3 Holdings] to a proprietary algorithmic trading solution, focused on crypto currencies, and a unique battery of informational data points to effectuate short, positional, swing trades on a high frequency, high risk mitigation basis," (2) the limited partners shall pay "software licensing fees and expenses," and (3) "[a]ctual realized fees and expenses of the GP, as well as any employment or licensing contracts, can be reviewed at the investors request." *Id.* at ¶ 61.

49.     The statements in the PPM and limited partnership agreement failed to fully disclose to investors the true nature of the licensing fees, including the costs associated with the

licensing fees, the methodology that would be used to calculate the licensing fees, and when the licensing fees would be assessed. *Id.* at ¶ 62.

50.     Additionally, in December 2018 Ackerman, Founding Partner 1, and Founding Partner 2 agreed amongst themselves that if Q3 I reached 15 percent monthly profitability, then they would be entitled to any excess over that 15 percent threshold. This was never disclosed to investors. Nor did Q3 I ever achieve monthly profits of 15 percent. *Id.* at ¶ 63.

### 3. Misrepresentations Concerning The Safety of the Investment

51.     Only Ackerman had log-in credentials for the Q3 Trading Account. Knowing that Founding Partner 1 and Founding Partner 2 would repeat the information to investors, Ackerman told Founding Partner 1 and Founding Partner 2 that controls were in place to protect the dissipation of investor funds. Specifically, he told Founding Partner 1 and Founding Partner 2 that he could not transfer funds into or out of the Q3 Trading Account without authorization from Founding Partner 1 or Founding Partner 2. *Id.* at ¶ 64.

52.     As Ackerman knew they would, Founding Partner 1 and Founding Partner 2 then repeated this representation to investors from no later than March 2018 until at least October 2019. *Id.* at ¶ 65.

53.     This representation was false. In truth, there were no safeguards in place to prevent Ackerman's unilateral transfer of funds. *Id.* at ¶ 66.

### 4. Misrepresentations Concerning The Use of Investors' Money

54.     Contrary to representations to potential investors that investor money would be invested in cryptocurrency trading, from March 2018 until December 2019, Ackerman misappropriated about $7.5 million of investor funds for his personal use. *Id.* at ¶ 67.

55.    Ackerman used these investor funds to, among other things, purchase and renovate a new home, pay more than $600,000 for personal security services, purchase more than $100,000 worth of jewelry at Tiffany & Co., and purchase three cars. *Id.* at ¶ 68.

56.    Ackerman's misappropriation of investor funds was not disclosed to potential investors or investors. *Id.* at ¶ 69.

### IV.   Ackerman Violated The Anti-Fraud Provisions of the Federal Securities Laws

57.    The decision whether to grant a motion for a default judgment "is within the sound discretion of the district court." *SEC v. Coronati*, No. 16 Civ. 2022, 2016 WL 6462240, at *2 (E.D.N.Y. Oct. 14, 2016) (quoting *United States Fidelity and Guaranty Co. v. Petroleo Brasiliero S.A.*, 220 F.R.D. 404, 406 (S.D.N.Y. 2004)). In making that determination, the court treats all factual allegations of the complaint (other than those pertaining to damages) as true and "then [ ] analyze[s] those facts for their sufficiency to state a claim." *Id.* (quoting *Brown v. Gabbidon*, No. 06 Civ. 8148, 2007 WL 1423788, at *2 (S.D.N.Y. May 14, 2007)).

58.    To establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Count IV-VI), the plaintiff must establish that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). For purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

59.    As to Counts I-III, "[e]ssentially the same elements are required under Section 17(a)(1)-(3) [of the Securities Act] in connection with the offer or sale of a security, though no

showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *Id*.

60.     "Information is material when there is a substantial likelihood that a reasonable investor would find it important in making an investment decision." *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012).  In Section 10(b) fraud cases, scienter requires an "intent to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)), which can be proved by "strong circumstantial evidence of conscious misbehavior or recklessness," *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Because scienter is not required in fraud cases under Section 17(a)(2) or (a)(3) of the Securities Act, "[a] showing of negligence is sufficient." *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).  *See also Aaron v. SEC*, 446 U.S. 680, 691 & 697 (1980).

61.     Ackerman's alleged conduct, deemed as true, satisfies the elements of the claims alleged against him. He fabricated screenshots that falsely represented active cryptocurrency trading using the Algorithm resulting in extraordinary profits.  He doctored these screenshots and sent them by text message to his general partners knowing that those fraudulent account balances and profits would be sent to investors.  [ECF No. 1 at ¶¶ 25-33].  He also misrepresented to investors that safeguards were in place to protect investor assets. *Id.* at ¶¶ 64-66.  Further, he failed properly and fully to disclose to investors the millions of dollars of Licensing Fees he received. *Id.* at ¶¶ 57-63.  Numerous investors continued to invest additional funds based on Ackerman's materially false statements, and Ackerman raised about $33 million from 150 investors.  *Id.* at ¶¶ 33 & 39.  Of the $33 million raised, Ackerman misappropriated $7.5 million of the investor funds for his personal gain, despite telling investor he would invest their funds. *Id.* at ¶¶ 667-69.

62.     Ackerman's misrepresentations were material because an investor would consider trading performance, the use of investor funds, safeguards over investor assets, and fees charged to investors important when deciding to invest or to continue investing. [ECF No. 1 at ¶¶ 22-69]. An investor would have wanted to know that contrary to Ackerman's representations that he was investing investor contributions, he was misappropriating investor funds to the tune of $7.5 million to, among other things, purchase and renovate a new home, pay more than $600,000 for personal security services, purchase more than $100,000 worth of jewelry at Tiffany & Co., and purchase three cars.

63.     Ackerman knowingly engaged in a scheme to defraud investors. Ackerman fabricated screenshots that falsely represented active cryptocurrency trading using the Algorithm resulting in extraordinary profits.  He doctored these screenshots and sent them by text message to his general partners knowing that those fraudulent account balances and profits would be sent to investors.  He also misrepresented that safeguards were in place to protect investor assets.  Further, he failed properly and fully to disclose to investors the millions of dollars of Licensing Fees he received.   Numerous investors continued to invest additional funds based on Ackerman's materially false statements.

64.     Ackerman acted with scienter, and therefore the lesser requirement of negligence required for claims under Section 17(a)(2) and (3) is satisfied. Ackerman directed all trading at issue. He knew, or was reckless in not knowing, the representations made to investors about the offering and falsity of the representations. *Id.* at ¶¶ 28 & 38-56.  Because Ackerman directed all trading, he knew or was reckless in not knowing that the licensing fees he charged – and failed to disclose – were not warranted because he had never invested in cryptocurrencies and had never used the algorithmic trading strategy that would have triggered such licensing fees. *Id.* at ¶¶ 28,

38, 57-63.  Further, Ackerman misappropriated investor funds for his personal use and did not invest investor funds, and therefore he knew or was reckless in not knowing that his representations about the use of investor funds were false. He was knew or was reckless in not knowing that he was statements were false because he personally doctored them, that he was misappropriating investor funds because he personally took those funds for his personal use, and that the trading and the algorithmic trading model were not the success he was claimed they were. *Id.* at ¶¶ 22-69.

65.     Ackerman's fraudulent conduct was "in connection with" the purchase or sale of securities, as he made the false representations, misappropriated investor funds, and engaged in his fraudulent scheme in the course of raiding investor funds for a securities offering. *Id.* at ¶¶ 22-69.  Ackerman used interstate commerce by use of the wires as well as through email and text messages. *Id.* at ¶¶ 43, 44, 48, 49, 55, 26.

66.     Thus, the Complaint adequately alleges the violations charged against Ackerman. Accordingly, the Court should enter a default judgment against Ackerman for violating Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act.

67.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that Ackerman will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the federal securities laws.

## V.  <u>The Relief Sought Is Warranted</u>

68.     Permanent injunctive relief is appropriate where a defendant has violated securities laws and there is a reasonable likelihood that he will do so again. *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978). In determining the likelihood of future violations, courts generally consider

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether

defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Id.* at 100.

69.     These factors support injunctive relief. As set forth above, the allegations, deemed as true, support a finding that Ackerman is liable for violations of the federal securities laws, and Ackerman acted with a high degree of scienter by doctoring records, making false representations to investors, and misappropriating investor funds for his personal use.  The conduct was not isolated, but spanned more than two years, from July 1, 2017 until at least December 1, 2019. Ackerman has given no assurance against future violations, has not taken responsibility for his misconduct, and there is currently no barrier whatsoever to Ackerman continuing to raise funds or engage in fraudulent conduct in connection with raising funds for his companies.

70.     "Disgorgement of ill-gotten gains is a congressionally and judicially recognized remedy for a violation of the securities law." *SEC v. Shehyn,* No. 04 Civ. 2003, 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010) (footnote omitted) (awarding disgorgement for, inter alia, violation of Section 15). While courts have broad discretion in determining both whether to order disgorgement and the amount to be disgorged, *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996), in setting the disgorgement amount, "a court must focus on the extent to which a defendant has profited from his [illegal conduct]," *Universal Express*, 646 F. Supp. 2d at 563.

71.     "[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (alteration in original) (quoting *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Once the SEC demonstrates such an approximation, the defendant has the burden to show that the full amount was not realized and therefore should not be disgorged. *See Universal Express*, 646 F. Supp. 2d at

563. Any uncertainty in calculating the defendants' illicit gains should be resolved in favor of the plaintiff. *Patel*, 61 F.3d at 140. A Defendant cannot be ordered to disgorge his ill-gotten gains twice.

72.     At this time, there are two pending cases seeking restitution against Ackerman based on the offering and misappropriation at issue in this case: *CFTC v. Ackerman*, 1:20-cv-01183-NRB (SDNY), *U.S. v. Ackerman*, 20-cr-00093-LTS (SDNY).  In the CFTC action, a motion for default judgment setting the restitution amount is currently pending. Because the restitution ordered in the CFTC case and that which might be ordered in the criminal case, could overlap with the amount sought in this case, the Commission will be permitted to file a supplemental memorandum after restitution has been entered in the parallel actions to request the amount, if any, that remains to be disgorged.

73.     Similarly, because any sentence imposed in the parallel criminal case is a factor that should be considered in setting a civil money penalty against Ackerman in this case, the Commission will be permitted to return to the Court to seek a civil money penalty amount after Ackerman is sentenced in the criminal case.

## VI.  <u>Permanent Injunction</u>

### A.  <u>Section 10(b) and Rule 10b-5 of the Exchange Act</u>

IT IS HEREBY ORDERED AND ADJUDGED THAT that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal

Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive

actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents,

servants, employees, and attorneys; and (b) other persons in active concert or participation with

Defendant or with anyone described in (a).

## B.  Section 17(a) of the Securities Act

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

(the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact

or any omission of a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading;

or

18

(c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## VII. <u>Disgorgement, Prejudgment Interest, and Civil Money Penalty</u>

IT IS FURTHER ORDERED AND ADJUDGED that Defendant is liable for disgorgement with prejudgment interest, and a civil money penalty, with the amounts to be determined upon the Commission's memorandum, which memorandum shall be filed by the Commission after restitution is determined in the parallel case *CFTC v. Ackerman*, 1:20-cv-01183-NRB (SDNY), and after restitution and sentencing are determined in the parallel case, *U.S. v. Ackerman*, 20-cr-00093-LTS (SDNY).

This Court shall retain jurisdiction of this action to determine the disgorgement, prejudgment interest, and civil penalty amounts, and to ensure compliance with this Order and for all other purposes related to this action.

* * *

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this Order of Default Judgment against Defendant Michael Ackerman without further notice.

IT IS SO ORDERED on this ___ day of _____, 2021.


_____
UNITED STATES DISTRICT JUDGE