Amie Riggle Berlin, Esq.
SECURITIES AND EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154
Email: berlina@sec.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | Civil Action No. 1:20-cv-1181 |
| v. | |
| **MICHAEL W. ACKERMAN,** | **COMPLAINT** |
| Defendant. | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**I. INTRODUCTION**

1. The Commission brings this action to enjoin Michael W. Ackerman ("Ackerman") from further violations of the anti-fraud provisions of the federal securities laws.

2. From no later than July 1, 2017 until at least December 1, 2019, Ackerman, through two entities he controlled, Q3 Trading Club and Q3 I, LP ("Q3 I") (collectively, the "Q3 Companies"), raised at least $33 million from more than 150 investors through the offer and sale of securities in the form of investment contracts. The majority of the investors are physicians.

**EXHIBIT 1**

3. Beginning no later than July 1, 2017, Q3 Trading Club offered investors the opportunity to pool money to invest in cryptocurrencies.

4. In approximately November 2018, Ackerman expanded his fraudulent offering scheme by offering investors the opportunity to invest in securities in the form of limited partnership interests in Q3 I. Ackerman claimed he would use investor funds to invest in cryptocurrencies.

5. To lure investors to make initial and repeated investments, Ackerman knowingly or recklessly materially misrepresented the success of his trading, the Q3 Companies' assets, the safety of the investment, and how the Q3 Companies would use investor money.

6. Specifically, Ackerman, the principal trader of the Q3 Companies, directly or indirectly told potential investors he developed and used a proprietary trading algorithm (the "Algorithm") that allowed him to take advantage of the volatility of cryptocurrencies when trading investor funds and earn profits while minimizing risks.

7. In truth, Ackerman invested no more than $10 million of the $33 million raised from investors in cryptocurrencies and the profits generated by the Algorithm were minimal, at best.

8. To conceal the truth from investors, Ackerman prepared false financial records by doctoring screenshots showing Q3 I's trading account balances. He also prepared monthly newsletters to investors or otherwise caused investors to receive false account information reflecting that the Q3 Companies generated monthly profits of at least 15%.

9. Contrary to information Ackerman provided, from November 2017 until December 2019, the Q3 Companies' trading account had a monthly balance averaging about $1.7 million.

10. Further, Ackerman adequately failed to disclose to investors that he and his partners paid themselves about $4 million of the investors' funds as purported licensing fees based on the purported use of the Algorithm.

11. On top of that, Ackerman made material misrepresentations about the safety of the investments to his partners, whom he knew would disseminate the information to investors. For example, Ackerman falsely stated that the Q3 Companies had safeguards in place to ensure that Ackerman, the only person with access to the Q3 Companies' trading account, could not withdraw funds without authorization from a second partner.

12. This was false. There were no safeguards in place. Ackerman in fact misappropriated approximately $7.5 million of investor funds for himself. Contrary to representations to investors that Ackerman would invest these funds, he used them to enrich himself. For example, he used investor funds to purchase and renovate a house, buy jewelry and multiple cars, and pay for personal security services.

13. Through his conduct, Ackerman has violated the anti-fraud provisions of the federal securities laws.

14. Based on the egregious nature of Ackerman's violations, he has shown he will violate the law unless the Court grants the injunctive and other relief the Commission seeks against him.

## II. DEFENDANT AND RELATED ENTITIES

### A. DEFENDANT

15. **Ackerman** is a resident of Sheffield Lake, Ohio. He is a member of the management team and one of the three owners of Q3 Holdings, LLC, which is Q3 I's general

3

partner.  Ackerman is a former registered representative of TradeStation Securities, Inc., Fortis Clearing Americas, LLC and UBS Securities, LLC.  He held Series 7 and 63 licenses until they lapsed in 2011.  According to Q3 I's private placement memorandum, Ackerman was an institutional broker on the floor of the New York Stock Exchange for 16 years.

### B. RELATED ENTITIES

16. **Q3 Holdings, LLC** is a Delaware limited liability company formed on June 10, 2018.  Ackerman, together with his two business partners, ("Founding Partner 1" and "Founding Partner 2"), created Q3 Holdings, LLC to act as the general partner for Q3 I.  Ackerman, Founding Partner 1, and Founding Partner 2 each own 33.3% of Q3 Holdings, LLC.

17. **Q3 I** is a Delaware limited partnership formed on July 27, 2018.  Q3 Holdings, LLC controls Q3 I.  According to the Q3 I limited partnership agreement, Q3 I was organized for the purpose of investing in cryptocurrencies.

18. **Q3 Trading Club** is a trading club Ackerman, Founding Partner 1, and Founding Partner 2 created in about June 2017, when they deposited $15,000 of their personal funds into a trading account for the purpose of trading cryptocurrencies.  Their investment strategy purportedly involved an algorithmic trading strategy created and employed by Ackerman.  About a month later, in July 2017, the Club began seeking investors through Facebook and word of mouth.

### III. JURISDICTION AND VENUE

19. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), (e) and 78aa.

4

20.     This Court has personal jurisdiction over Ackerman, and venue is proper in the Southern District of New York, because many of Ackerman's acts and transactions constituting violations of the Securities Act and Exchange Act occurred in the Southern District of New York. Since no later than Summer 2018, the Q3 Companies' bank accounts have been located in New York, New York. In addition, at least one investor resides in New York, New York.

21.     In connection with the conduct alleged in this Complaint, Ackerman, directly or indirectly, singly or in concert with others, has made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, or of the mails.

### IV.  THE SECURITIES FRAUD

#### A.  The Q3 Trading Club

22.     In approximately June 2017, Ackerman, Founding Partner 1, and Founding Partner 2 created the Q3 Trading Club to trade cryptocurrencies based on Ackerman's purportedly successful Algorithm.

23.     In July 2017, Ackerman, Founding Partner 1, and Founding Partner 2 began seeking investors in the Q3 Trading Club through Facebook and word of mouth.

24.     Specifically, at that time, Founding Partner 1, who is a surgeon, was a member of a private Facebook group called the "Physicians Dads Group" (the "PD Group"). All or substantially all of the members of the PD Group were physicians. In at least one July 2017 post in the PD Group, Founding Partner 1 explained that he had joined a club in which members pooled their funds to trade cryptocurrencies and offered to explain the investment strategy to any member of the PD Group, upon request. Some of the members of the Facebook group either requested, or were invited by Founding Partner 1, to invest in the Q3 Trading Club.

5

25. Founding Partner 1 told investors that they were entitled to 50% of any trading profits, and that he, Founding Partner 2, and Ackerman were entitled to the other 50%.

26. New investors in the Q3 Trading Club were directed to wire their capital contributions to Founding Partner 1's personal bank account. Founding Partner 1 then wired those funds to digital currency trading platforms in New York, New York and San Francisco, California, where the investor funds were converted to cryptocurrency.

27. The cryptocurrency was then sent to an offshore digital currency trading platform incorporated in the British Virgin Islands where Ackerman opened a trading account in late 2017 (the "Q3 Trading Account").

28. By January 2018, Ackerman was directing all of the Q3 Trading Club's trading through the Q3 Trading Account.

### B. The Q3 I Offering

29. On July 27, 2018, Ackerman, Founding Partner 1, and Founding Partner 2 formed Q3 I.

30. From no later than November 1, 2018 until at least December 2019, Ackerman, Founding Partner 1, and Founding Partner 2 offered investors the opportunity to invest in limited partnership interests in Q3 I.

31. Ackerman and his partners marketed the Q3 I investment through the distribution to potential investors of a private placement memorandum (the "PPM"), a limited partnership agreement, and a subscription agreement.

32. The PPM, dated November 1, 2018, states Q3 I was seeking up to $15 million in investor contributions. According to the PPM, Q3 I would use investor funds to invest in

6

cryptocurrencies using "proprietary high velocity trading software in a methodically risk mitigating fashion…."

33. The PPM also represented to investors that over the course of the prior 24 months, Q3 Holdings' personnel had "successfully traded various crypto currencies through various crypto exchanges using proprietary algorithmically driven software for other pooled investment groups."

34. According to the PPM, Q3 I would use the Algorithm and the trading experience of Q3 Holdings' management to generate trading profits, 50% of which would go to Q3 Holdings and 50% of which would be received by investors.

35. According to the Q3 I limited partnership agreement, dated November 1, 2018, the minimum investment in Q3 I is $50,000 and investors may make additional investments of at least $20,000.

36. By December 2019, the Q3 Companies had raised at least $33 million from more than 150 investors located throughout the United States.

### C. Ackerman's Fraudulent Conduct In The Offering

37. In connection with the offering, Ackerman engaged in fraudulent conduct.

38. Ackerman directed the Q3 Companies' trading and was a principal in each company. He knew, or was reckless in not knowing, the representations made to investors about the offering and falsity of the representations.

#### 1. Misrepresentations Concerning Trading Profits

39. The Q3 Companies were able to successfully solicit new investors and continue to receive additional investments from current investors due to the purported success of the Algorithm in producing generous trading profits.

7

40. In truth, Ackerman, who conducted all trading, did not realize significant trading profits for investors using the Algorithm.

41. Contrary to the representations to investors, only about $10 million, at most, of the $33 million raised from investors was invested in cryptocurrencies.

42. From no later than March 2018 until at least December 2019 Ackerman reported the Q3 Companies' trading profits and account balances to Founding Partner 1 and Founding Partner 2 for purposes of Founding Partner 1 calculating the Q3 Companies' trading performance and each investor's pro rata share of the purported profits.

43. When Ackerman reported the trading profits and account balances to Founding Partner 1 and Founding Partner 2, he knew that Founding Partner 1 would use the information to calculate the Q3 Companies' trading performance and each investors' pro rata share of profits so that Founding Partner 1 and Founding Partner 2 could disseminate this information to investors each month via email messages.

44. Ackerman sent these reports to Founding Partner 1 and Founding Partner 2 by text message or by sending purported screenshots of these account balances as reflected on the online trading platform for the Q3 Trading Account.

45. Each month from no later than March 2018 until at least December 2019 Ackerman reported to Founding Partner 1 and Founding Partner 2 that monthly trading profits were at least 15%. Ackerman sometimes modified screenshots of the Q3 Trading Account statement balances as reflected on the online trading platform to provide support for these representations.

46. The reports Ackerman sent Founding Partner 1 and Founding Partner 2 were false. In truth, from November 2017 until December 2019 the monthly account balance averaged only

8

about $1.7 million. During that time, the monthly account balance was never higher than about $5.815 million.

47. Nonetheless, by December 2019, Ackerman was reporting an account balance to Founding Partner 1 and Founding Partner 2 of about $310 million. In truth, however, the account only held about $428,162 in mid-December 2019.

48. Additionally, Ackerman drafted false email messages addressed to investors touting trading profits of 15% and higher. Ackerman sent these messages to Founding Partner 1 and Founding Partner 2 who then forwarded them to investors.

49. For example, on May 8, 2018, Ackerman sent Founding Partner 1 and Founding Partner 2 an email message stating that the Q3 Companies experienced trading profits of 15.11% for the month of April 2018. That same day, Founding Partner 1 forwarded Ackerman's message to investors.

50. Ackerman's representation was false or misleading. The trading profits were minimal, and the Q3 Trading Account had a balance of only $1,026,729.01 for the month ending April 2018.

51. Similarly, on March 5, 2018, Founding Partner 1 forwarded investors a message Ackerman addressed to "Q3 Members" stating "our profitability maintained a 15%+ monthly performance."

52. Founding Partner 1 or Founding Partner 2 reported trading profits of 15.96% for March 2018, 15.11% for April 2018 and 15.56% for August 2018. In truth, Ackerman had only invested a fraction of the $33 million of investors' funds in cryptocurrencies and trading profits on those investments were minimal. The monthly trading account balances from November 1, 2017 until September 1, 2018 were as follows:

9

| Date | Account Balance |
|---|---|
| 11-01-2017 | $6,027.44 |
| 12-01-2018 | $12,083.75 |
| 01-01-2018 | $145,028.76 |
| 02-01-2018 | $292,269.27 |
| 03-01-2018 | $689,558.36 |
| 04-01-2018 | $259,397.22 |
| 05-01-2018 | $1,026,729.01 |
| 06-01-2018 | $833,196.07 |
| 07-01-2018 | $2,931,675.46 |
| 08-01-2018 | $3,504,394.85 |
| 09-01-2018 | $1,936,736.03 |

53. Similarly, on September 5, 2018, Ackerman prepared a message for investors stating that "we ended the month with a 15.44% gain." In truth, the account balance was $1,936,736.03 on September 1, 2018, which was about $1.5 million less than the balance on August 1, 2018. As with Ackerman's other messages to investors, Founding Partner 1 forwarded Ackerman's message to investors.

54. Investors received false information about the profitability of their investments because account statements were prepared based on the false information Ackerman provided.

55. For example, on September 1, 2019, Ackerman sent a text message to Founding Partner 1, attaching a screenshot purporting to show the Q3 Trading Account balance was about $181,930,351. Based on this information, investors received account statements showing a substantially similar balance in the Q3 Trading Account and their pro rata share of trading profits.

56. However, in truth the Q3 Trading Account balance was only $1,503,145.57 on September 1, 2019.

### 2. Misrepresentations Concerning Licensing Fees

57. From no later than April 2018 until at least November 2019, Ackerman, Founding Partner 1, and Founding Partner 2 paid themselves at least $4 million of investors' funds as purported licensing fees based on the Q3 Companies' use of the Algorithm.

10

58. Ackerman was not entitled to any licensing fees and the licensing fees were not adequately disclosed to investors. Even if they had been, no licensing fees could have legitimately been charged because the majority of investor funds were never invested in cryptocurrencies and were therefore not exposed to the algorithmic trading strategy.

59. In November 2018, the PPM and Q3 I limited partnership agreement disclosed for the first time that licensing fees could be charged.

60. Specifically, the limited partnership agreement states that the limited partners shall pay for "any and all software licensing fees payable to the [general partner, Q3 Holdings]."

61. The PPM provides that: (1) the limited partners "will leverage a nonexclusive license from the [general partner, Q3 Holdings] to a proprietary algorithmic trading solution, focused on crypto currencies, and a unique battery of informational data points to effectuate short, positional, swing trades on a high frequency, high risk mitigation basis," (2) the limited partners shall pay "software licensing fees and expenses," and (3) "[a]ctual realized fees and expenses of the GP, as well as any employment or licensing contracts, can be reviewed at the investors request."

62. The statements in the PPM and limited partnership agreement failed to fully disclose to investors the true nature of the licensing fees, including the costs associated with the licensing fees, the methodology that would be used to calculate the licensing fees, and when the licensing fees would be assessed.

63. Additionally, in December 2018 Ackerman, Founding Partner 1, and Founding Partner 2 agreed amongst themselves that if Q3 I reached 15 percent monthly profitability, then they would be entitled to any excess over that 15 percent threshold. This was never disclosed to investors. Nor did Q3 I ever achieve monthly profits of 15 percent.

11

### 3. Misrepresentations Concerning The Safety of the Investment

64. Only Ackerman had log-in credentials for the Q3 Trading Account. Knowing that Founding Partner 1 and Founding Partner 2 would repeat the information to investors, Ackerman told Founding Partner 1 and Founding Partner 2 that controls were in place to protect the dissipation of investor funds. Specifically, he told Founding Partner 1 and Founding Partner 2 that he could not transfer funds into or out of the Q3 Trading Account without authorization from Founding Partner 1 or Founding Partner 2

65. As Ackerman knew they would, Founding Partner 1 and Founding Partner 2 then repeated this representation to investors from no later than March 2018 until at least October 2019.

66. This representation was false. In truth, there were no safeguards in place to prevent Ackerman's unilateral transfer of funds.

### 4. Misrepresentations Concerning The Use of Investors' Money

67. Contrary to representations to potential investors that investor money would be invested in cryptocurrency trading, from March 2018 until December 2019, Ackerman misappropriated about $7.5 million of investor funds for his personal use.

68. Ackerman used these investor funds to, among other things, purchase and renovate a new home, pay more than $600,000 for personal security services, purchase more than $100,000 worth of jewelry at Tiffany & Co., and purchase three cars.

69. Ackerman's misappropriation of investor funds was not disclosed to potential investors or investors.

## VI. CLAIMS FOR RELIEF

### COUNT I

**(Violations of Section 17(a)(1) of the Securities Act)**

12

70. The Commission repeats and realleges paragraphs 1 through 69 of its Complaint.

71. From no later than March 2018 until at least December 2019, Ackerman, in the offer or sale of securities, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud.

72. By engaging in the foregoing, Ackerman, directly or indirectly violated and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

**(Violations of Section 17(a)(2) of the Securities Act)**

73. The Commission repeats and realleges paragraphs 1 through 69 of its Complaint.

74. From no later than March 2018 until at least December 2019, Ackerman, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, negligently obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

75. By engaging in the foregoing, Ackerman, directly or indirectly violated and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

**(Violations of Section 17(a)(3) of the Securities Act)**

76. The Commission repeats and realleges paragraphs 1 through 69 of its Complaint.

77. From no later than March 2018 until at least December 2019, Ackerman, in the offer or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails, negligently engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

78. By engaging in the foregoing, Ackerman, directly or indirectly violated and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) Thereunder)**

79. The Commission repeats and realleges paragraphs 1 through 69 of its Complaint.

80. From no later than March 2018 until at least December 2019, Ackerman, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes or artifices to defraud.

81. By engaging in the foregoing, Ackerman, directly or indirectly violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) thereunder [17 C.F.R. § 240.10b-5(a)].

## COUNT V

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder)**

82. The Commission repeats and realleges paragraphs 1 through 69 of its Complaint.

83. From no later than March 2018 until at least December 2019, Ackerman, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in

connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts in order to make the statements made, in the light of the circumstances in which they were made, not misleading.

84. By engaging in the foregoing, Ackerman, directly or indirectly violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## COUNT VI

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(c) Thereunder)**

85. The Commission repeats and realleges paragraphs 1 through 69 of its Complaint.

86. From no later than March 2018 until at least December 2019, Ackerman, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly engaged in acts, practices, and courses of business which have operated, are now operating, and will operate as a fraud upon the purchasers of such securities.

87. By engaging in the foregoing, Ackerman, directly or indirectly violated and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(c)].

## VII. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendant committed the violations alleged and:

### A.

### Permanent Injunctive Relief

Issue a Permanent Injunction, enjoining Ackerman from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### B.

### Disgorgement

Issue an Order directing Ackerman to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts and/or courses of conduct alleged herein.

### C.

### Civil Penalty

Issue an Order directing Ackerman to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

### D.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

### E.

### Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

# VIII.

## **DEMAND FOR JURY TRIAL**

The Securities and Exchange Commission hereby demands a jury trial in this case.

Dated: February 11, 2020				Respectfully submitted,


		By:	_____
			Amie Riggle Berlin
			Senior Trial Counsel
			N.Y. Bar No. 3052685
			Direct Dial: (305) 982-6322
			Email: BerlinA@sec.gov

			Attorney for Plaintiff
			Securities and Exchange Commission
			801 Brickell Ave., Suite 1800
			Miami, FL 33131
			Telephone: (305) 982-6300
			Facsimile: (305) 536-4154

to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VIII.

### **DEMAND FOR JURY TRIAL**

The Securities and Exchange Commission hereby demands a jury trial in this case.

Dated: February 11, 2020

Respectfully submitted,

By: *[signature]*

Amie Riggle Berlin
Senior Trial Counsel
N.Y. Bar No. 3052685
Direct Dial: (305) 982-6322
Email: BerlinA@sec.gov

Attorney for Plaintiff
Securities and Exchange Commission
801 Brickell Ave., Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154